Would you call the case, please? 18-718, Aplan-Wilis v. Morales v. Davis. Good evening, Your Honor. My name is Patricia Raymond, R-A-Y-M-O-N-D. Also for Aplan is Clark Raymond, R-A-Y-M-O-N-D. And for the defendants, James Stamos, S-T-A-M-O-S. Great. Okay, well each side will have 20 minutes. You don't have to use it all. Does the appellant want to reserve some time? Yes, we would, Your Honor. How much do you want? Five minutes. Okay, you're probably aware of this. This microphone does not amplify at all. It simply records. So you have to keep your voice up so all of the folks can hear you, okay? Great. And what we'd like to do is share part of the opening argument. Does anybody have an objection? Do you have an objection? Okay. Thanks. Do you have any objection, counsel? No objection. Okay. Okay, Your Honor. May it please the Court. Good afternoon, Your Honors. My name is Patricia Raymond, and I, with my partner Clark Raymond, have the honor of representing Alma Willis in this appeal. I will be taking the first few minutes to talk about the issues related to the race ipsa loquitur case and the dismissal of the race ipsa loquitur case. Your Honors, this was a classic race ipsa case. Alma Willis had surgery on her chest and on her belly, and when she awoke, she immediately complained of pain in her elbows. There is document in it. Is that in any of the documents from the hospital's records that she complained? No, it's in her testimony. Was there anything, but nothing in the records that said that. That's right? No. She did complain of pain, though. She complained of pain in her testimony, but there's nothing in the records that the experts looked at that said anything about any complaints about pain. Was there? That's correct, Your Honor. That's correct. Following her recovery, after recovery, there was a significant amount of morphine that was given to her in the first eight hours. She had a tremendous amount of pain and swelling in both of her arms. She was unable to care for herself. In both of her arms? Yes. She testified to that? She testified to it, and it's documented in the medical records. It's documented in the medical records as three-plus pitting edema in both of her arms. Did your experts testify to that? Yes. I thought they said there was no documented complaints of the right arm pain in the medical records. We're talking about edema right now, but she has a large amount of swelling. Well, she just had surgery. But she had surgery, Your Honor, in her chest and in her stomach. So did she complain about her right arm or her left arm? She was very sleepy. So we don't know. I mean, there's a big difference between the right-hand side of the body and the left-hand side of the body. This case really depends on right side or left side. And looking at your briefs, sometimes you talk about right side, sometimes you talk about left side, sometimes you just talk about arms. And it's very confusing and not clear what side of the body you're talking about. To me, it's very specific what you're talking about and where the complaints are. And if it's vague, like you're just saying, it's not clear. In her ñ well, it's ñ as far as her complaints, she was very stimulant. She was very tired. She had just had almost 13 hours of surgery. So the next day, she was basically not able to do anything for herself. But the nurses document a large amount of swelling in both of her arms. When she's discharged from the hospital, she's unable, and she continues to be unable to do anything. And so the court's aware that she's ñ Anything with what? She can't do ñ she can't feed herself. She can't ñ Is she left-handed or right-handed? She's left-handed, but she's ambidextrous. Well, didn't the testimony say she was left-handed? But she uses both of her hands basically. But for eating and so forth, she's left-handed. Yes. And so the court's aware it was our ñ it's our contention that she did sustain bilateral injuries, that she had arm boards on both of her arms. However, the permanent injury was to her right arm, where she had a large hematoma, and an MRI indicated that she had a complete severance or her ñ the neurological injury was to her median nerve at the right arm. When was the MRI taken? It was taken a month and a half after the ñ That's right. And that was after the second visit to the hospital. So how is that relevant? If you're saying that these doctors and nurses are responsible, then that shouldn't have anything to do with it. The first surgery is the only thing that's relevant, isn't it? Why would the ñ why would that be relevant? Why is it relevant, what the MRI shows? You didn't sue those doctors with regard to the second hospitalization? Because we believe they didn't do anything wrong. That's why they weren't sued. Your Honor, the injury were ñ we believe occurred during the surgery itself. If you look at the records contemporaneously, when Alma Willis was in the hospital for the second admission on May 30th, when she is ñ she complains of the right arm pain, she tells the nurse, I have pain in my index, my ring finger, and my baby finger. The doctors are aware of it. It's been since surgery. It's documented in the medical records multiple times. She also, when she goes to see her primary care physician, she also tells her primary care physician that she's had this injury since the surgery. Then she also told them about the carpal tunnel. There is one entry in one medical record about ñ she believes she has a history of carpal tunnel. Well, the facts are there's no other ñ during the litigation, everyone got all of the medical records, and there was no indication she ever suffered from any complaints other than when she was treated for breast cancer approximately seven or eight years before the occurrence. And at that time, she was receiving radiation and chemotherapy, and she had numbness and tingling to the right fingers, and that went away. She also testified to that at trial. It was also testified about that by my experts, who said that that particular complaint of carpal tunnel to Dr. Singh, the primary care physician, was likely not carpal tunnel at all, but likely the complaints of the numbness and tingling to her fingers. She gave a consistent history to Dr. Singh that the injury occurred after the surgery. She also gave a consistent history to Dr. Coates. Dr. Coates was the orthopedic surgeon that saw Alma Willis after Dr. Singh saw the patient and MRI was ordered. Dr. Coates testified that it was his opinion that the surgery caused the injury and that somebody either leaned on her or the restraints were too tight on her arms. So that's the testimony from the treaters. Was there any change in her condition between the first surgery hospital visit and the second hospital stay? What happened was she, because she wasn't able to move around because her arms were so swollen and big, she developed bilateral pulmonary embolisms, and she became very confused and disoriented. So those first few days while she's in the hospital, she's very confused and disoriented, and that's well documented in the medical records. In fact, when her daughter called Dr. Flagg, her concern was, my mother is not making sense, she's not speaking in sentences. So Dr. Flagg told her, bring her into the emergency room. She's admitted to the emergency room, and that's where the care was provided and it was discovered that she had bilateral pulmonary embolisms. You believe that the facts are clear that the pain that she complained of regarding her right arm was immediately after the surgery and had nothing to do with the second hospital stay? Absolutely. Because we struggle with, I struggle with those facts. I won't speak for anyone else. Absolutely. This whole issue that the injury occurred during that second hospitalization was something that was conjured up by the defense in this medical malpractice case approximately six months before we went to trial. That's the first time that we heard about the injury occurring during that admission. No physician, no treating physician, no care was ever provided to Amaryllis based upon any injury that she sustained during that admission. That was a conjured, created defense in a medical malpractice case so they could explain the injury to the jury because they knew we were going to be able to bring a res ipsa case. I mean, the burden of proof changes regarding that cause, the cause of the injury. Res ipsa, is that a rule of evidence or a cause of action? It's a cause of action. It's a cause of action under Illinois law. That's your position. I want to make it very clear. You say it's a cause of action and not a rule of evidence. That's my question. Yes or no? Yes. Yes, it's a cause of action. It's a cause of action. It's not a rule of evidence. So no to the rule of evidence, yes to the cause of action. That's your position. Is that correct? Yes. What is the purpose of res ipsa lacata? It creates an inference that negligence occurs when the instrumentalities or when the plaintiff doesn't have control of the instrumentalities and the defendants do. It's circumstantial evidence? It creates an inference of negligence. Yes, it's based upon the circumstantial evidence. It's circumstantial evidence that when the plaintiff went into the surgery or when the occurrence happened, the plaintiff was normal, and for whatever reason when the plaintiff came out of the surgery, she was injured or damaged. So in order for that to be valid, you wouldn't have a case with direct evidence of injury, would you? We don't. What we did, Your Honors, is we tried in our 213s, we talked to our experts and we said, well, how could this have happened? So what we did is we disclosed that this could have happened by the defendants giving too much fluid, the restraints being on too tight. They explained different ways that someone even said that maybe the doctor leaned on her arm. That's true, because her arms were out like this on armboards. In fact, one of the defendants, Dr. McCormick, testified that they put armboards that were wrapped around her arms and everything and they brought them into the courtroom. And then Mr. Kowalczyk came in and he said, we didn't use that at that time. They asked me to bring these to court, but we didn't use that at that time. So we were able to get that testimony, and what they were using is just flat armboards. But all your experts testified to the median nerve injury if the elbow was due to compression. That's correct? Yes or no? No. They did not all testify to that? They testified that it was multivectorial. They were questioned on – Well, maybe it could still be multivectorial. I think all three testified to compression. Did they all testify to compression? There was compression from various causes. Did they all testify – your major experts testify that it was compression? Each of them said that. It was compression, yes. Yes. They all said that that was. So that's direct evidence of his compression, isn't it? That's not circumstantial. Well, they said it could be – what they were disclosed to testify to and what they testified. It could be caused by this. It could be caused by too much fluids. It could be caused by the fact that somebody leaned up against the patient for a number of minutes. That is what they testified to. And it was so that we wanted to make sure that the jury had some type of explanation, and it wasn't just an inference, it was an explanation how could this have happened. Well, didn't Dr. Fernandez testify that the nerve injury at the elbow was a result of significant compression of at least two hours of continuous pressure? I believe on cross-examination that's what he testified to. Well, he testified to it, didn't he? That's what he testified to on cross-examination, yes, Your Honor. Was it a matter of his cross-examination or not? No, I suppose it doesn't. One is substantive evidence, however. We had retained Dr. Fernandez just simply for the purpose of describing what her injuries were and that her injuries were real. So it was a question. They were claiming that she was faking it. So didn't Dr. McKelvin also testify that the median nerve injury at the elbow was due to compression several times? I believe Dr. McKelvin did, but Dr. McKelvin's primary opinion was that it was multifactorial, which I believe was one of the things that we complained about, what we're complaining about in this appeal, because I believe the court was attempting or barred him from testifying that it was multifactorial, even though it was well documented in his testimony that in his deposition and in his disclosures he would testify to that. I just have a question because I'm not sure who's going to handle this issue, but the defense is arguing that this case is different from Silverstein and Pearson in that the negligence claim still remained after the motion to eliminate was granted and therefore it wasn't a total dismissal of the entire case as it was in those cases. Now, who's going to handle that issue? You are. Go ahead. Yes. As far as the total, it's a total dismissal of a claim, which we believe falls under 2.1. It's not just a negligence claim. That's part of your dialogue with Justice Hyman, whether it's a claim or whether it's not. That's right. Your position is it's a claim. It's definitely a claim, and it's a very important claim. Like I said, this, we believe, is a classic res ipsa loquitur case. If it is not a claim and it turns out it's a rule of evidence, you lose, right? We only lose on whether 2.1 would apply and whether it was a proper motion to eliminate under that Silverstein case. So the res ipsa loquitur, that's the basis for your claim under res ipsa. So you would lose on that. You have other arguments, but. I don't believe that we would lose on that issue. You're saying it's a cause of action. I'm saying if you are wrong on that, then you would lose under res ipsa. Under the rules, you would lose. Only if the Court found that it was appropriate for Judge Hanlon to have dismissed our res ipsa claim. Well, again, you're saying it's a claim. If it turns out under Illinois it's not a claim but a rule of evidence, you lose. I respectfully disagree, Your Honor, because I think the Court, even if it was a proper motion. I disagree with that. That it's a claim or it's evidence. I disagree that we would lose. Okay. I think we should still prevail because I think it was improper for the Court to dismiss our res ipsa count at that point. We had all, the fact that what they argued at trial was because there was a direct negligence claim that we could not prosecute the res ipsa claim. And I think the Court's been clear. But I think the Court supports your position. Yes, it does. The Supreme Court's case from December 19, 1990, because in that case they made it clear as it was argued in the trial court that the res ipsa claim couldn't exist simultaneously. The negligence claim, I think the Supreme Court affirmed, the appellate court said that it could exist. So that supports your position. That's exactly correct. And what the Supreme Court said is that there's. You guys always spelled it in your briefs, by the way. I did read the case, too. You both spelled it K-O-W, it's K-O-L. Thank you, Your Honor. I apologize. You both. But the Supreme Court was very clear that you can have both a res ipsa and a negligence case. Go ahead. And they said it's actually a good thing because it can explain things to the jury as what we were trying to do. It provides further basis for the plaintiff's claim. A quick comment. The defendant's trial story in this case was that there was no proof that any injury occurred at surgery, that the first complaint by the plaintiff was on May 30th after the surgery on May 21st, and that the plaintiff pulled out an IV from her right arm on May 29th. It was covered in the openings of all three defense counsel. There's a problem with that defense story is that that wasn't disclosed in 213. The basis to what they did is they asked some questions of C.R.N.A. Anderson, one of their experts, and they asked her, Ms. Anderson, is there any evidence of an injury in the medical records stated prior to the time of the needle stick on May 29th? And she said, that's correct, there is none. Then they asked Dr. Louito the same question, and he agreed. Now, C.R.N.A. Anderson was disclosed under 213. There was no mention of this needle stick on the 29th anywhere in her disclosures. It wasn't covered. She sat for a 100-page deposition. There was no discussion of it whatsoever. Dr. Louito, same story, 192-page deposition of Dr. Louito, no mention of that whatsoever. In closing, all the counsel talked about this. The attorney for the surgeon said, I think what happened here is Ms. Willis accidentally pulled down her IV on the 29th, and only after this happens is the first time she ever reports to anyone, I've got a problem with my median nerve in the right hand, the thumb, the index finger, and the middle finger. And that's the first time there's any complaint in the record. Of course, he left off that she also said, I've had this since surgery, and my doctors are aware. Mr. Berko, who represented one of the C.R.N.A.'s, said that the plaintiff pulled out her IV line. Actually, he said, if you just look at the facts, there's an MRI from July 21st that shows a hematoma compressing the median nerve in the right arm. On June 17th, 2008. Who testified with regard to the pain in the right arm? The plaintiff did. The plaintiff did. And I thought, your co-counsel just said that she was confused or after surgery, she wasn't speaking right, and you're saying that she knew then that even though she was confused and the doctor had to come in and all this stuff, she was not confused about that? She complained of the pain in her right arm, correct. She did. And she testified that she had identified the location being in the right arm, and that's her testimony? No, she did not. She didn't. Okay. I wanted to clarify. Okay. Mr. Burkert also, the attorney for the CRNA, also said that on May 29th, she pulled out her IV and bled because she was on anticoagulants, and that on May 30th is the first time she made a complaint about this problem in her median nerve. The attorney for the anesthesia people talked about the needle stick being the most logical. Basically what you're saying is you believe that the defendant sandbagged you. I mean, isn't that the bottom line? They came up with a new trial story at the time of trial. That's being sandbagged. I mean, you didn't know it, but your complaint is I didn't know about this. The first time I learned about it was at trial. They never disclosed it at any time. So the judge had an interesting way of handling 213 objections. We brought motions in limine with specific testimony and seeking to bar them from talking about other things. And her policy on 213s was we'll see what happens when we get to the end of the sentence.  We're not going to do that. And I'll just take it all under advisement, and we'll see what happens then. In fact, I know what she would say is, well, I'm not going to stop them from testifying to things, handle it on cross-counsel, which, you know, 213, that's not the way it really is supposed to work. If it's not disclosed, it shouldn't come out in the first place, and it's very difficult to handle someone violating 213 on cross-questioning. So she didn't challenge the proponent of the testimony. Where was it disclosed? Exactly. The other problem with the defendant's story in the case is they had two witnesses, experts, both neurologists, Drs. Glanz and Davison, and they didn't agree with that trial story. So Dr. Glanz was a neurologist. He testified that this was not from an IV stick, this injury, documented injury of the median nerve was not from an IV stick, and that it probably came about from her diabetes or some sort of an infectious process that damaged the nerve. Dr. Davison said what happened was when she got that EMG done, which is a test they do with needles to test the conductivity of nerves, and they actually push the needles into the muscles as a test. He said that when they did the EMG on her, that that's when they put the EMG needle into the median nerve and caused injury. So that was Dr. Davison's theory. Clearly, those are completely contrary to the defense story that it was from pulling out an IV, and at the start of trial, we were told we had to schedule the whole trial as far as the witnesses went. Now, these two got scheduled on the very last day. Didn't they tell you if you wanted to call them, they were available? They told us. So it was end of trial on the day, and they were the last two witnesses to go the next day, and they said, you know, I'd be happy to make them available to you tomorrow, was the way it was said. So what's wrong with that? Well, what's wrong with that is it puts me in a trick bag, because I get to call them to put on info. They get to cross-examine. They examine their own experts at length, and mind you, Dr. Glantz is someone who testifies 95 percent of the time for defense. They'd already paid him $50,000 in the case. But that's totally irrelevant. It goes to the bias, which— But you could have called them. I mean, they gave you that opportunity. They said it. You wanted to bar them. Now you want to have them testify, right? Earlier you wanted them barred, and now you're saying, oh, we shouldn't— even though you're the one that asked them to be barred, now you want them to testify, and you want them to call them even though they decided not to. I think that happens sometimes. That's right. So we brought a motion, as your advocate said, we brought a motion of accumulative evidence. And that was their theory. It was cumulative. That's why they said, well, we're not going to call them. That's what they said. They did object to our motion and fight it, and it was, again, taken under advisement. We'll see what happens. But I would point out to the court, the discussion on the record about that motion in Rimini was that we were faced with multiple CRNA experts, multiple anesthesia experts, these two neurology experts. But both of the witnesses that they did not call were the neurologists. Now, we put on an expert neurologist, and we called a treating neurologist to testify. They put on no neurology testimony. So it's—and given their testimony, what they say, contrary to the front story in the case, does not mean it's cumulative. But what evidence do you have that they weren't available to you? I mean, you could have called them. Did you try to call them, and somebody said no? No. There was no story that we were given that they were unavailable to comment. And that's one of the elements, though, right, of the missing person instruction, isn't it, that they were not equally available? I think what—if we look at some of the case law, especially the Supreme Court case of Taylor v. Coley, it specifically addresses the reality of hired expert witnesses and that these people are not—these people, even though they're retained experts and technically independent, that they're truly under the control of the party that hires them. And I think that's the situation here. But they offered to have them come, so I don't see where the problem is. Well, I don't think that's really a legitimate offer, given the situation where we're doing jury instructions, we're doing our closing, and now I'm being told, you know, we want you to bring these people in and— But you were prepared because you thought they were going to have a testimony the next day, so you were prepared. Again, I don't see where the prejudice is. How were you prejudiced? I was prejudiced—well, we were prejudiced because they, in combination with the 213 violation, what the defendant did is they crafted the most persuasive defense story that was unified, even though it had not been—the case had not been worked up with that story. The case had been worked up with all these different scenarios of what caused the injury. And then what they did is they changed course of trial and came up with a unified story by violations of 213 and by dropping witnesses at the last moment. Now, that's a point out to the court that in opening statements, counsel have discussed their own experts. These two were never discussed in opening. Thank you. Mr. Jones, members of the Court, James J. Stamos on behalf of all of the defendants. I'll address the res ipsa first, if that's appropriate. We believe the res ipsa instruction was properly refused here for two interconnected reasons. The first reason is this. Res ipsa is appropriate where we have a known injury and the plaintiff does not have access to the information and evidence necessary to demonstrate that negligence occurred in causation of the injury. If you would, would you address the motion in limine as a dispositive motion? Because that's the part that when we talk about what evidence was produced at trial, when you win on the motion in limine, then the evidence isn't going to be produced. The motion in limine, you're asking whether it was inappropriate to have addressed it by way of motion in limine. To dismiss the claim by way of motion in limine. Under the Bozma case, as well as other cases, res ipsa loquitur is not a cause of action. It's an evidentiary tool used in circumstances in which the plaintiff does not have access to the information. What about the code of civil procedure that sets out what you have to do to plead a res ipsa claim? What about that you have to have a separate affidavit? Well, so let's back up for a second. The argument I understand from the plaintiff, and I understand the principles that you're addressing here, would be in the Silverstein case, for example, where the court found that it's inappropriate to bring a motion in limine as a summary judgment motion. First of all, and I think the court, this court addressed it in the Oakage case, which is that there has to be a separate claim you're dealing with. So in the Oakage case where they found that a motion in limine was an inappropriate sub rules of summary judgment motion, the court found that there were two separate claims. There was a claim for injury and negligence during surgery, and injury and negligence in the treatment after surgery. And the court found that there was, when the defendant brought a motion for motion in limine to bar testimony about the second claim, that is to say the post-operative care, the court found, the appellate court found, that the trial court was wrong. It should not have allowed that motion to proceed because it was a sub rules of summary judgment motion, because it disposed of a claim. And the court in that instance found there was a specific claim. It was a different negligence claim. Here, we don't have that. There's a negligence claim for having injured this woman's arm, and res ipsa was going to be the method by which they were going to prove it. In a summary judgment, I'm sorry, in a medical malpractice case under Section 2-1113, there's a specific statutory provision that says the court must, in a medical malpractice case, make a determination of whether res ipsa applies. It doesn't say how you do that. It doesn't say you bring it by a motion for summary judgment. And if you think about it, it wouldn't make any sense to bring it by a motion for summary judgment because if you come in and you tell the court under 1113, Your Honor, I would like you to determine that res ipsa doesn't apply, if the court grants that motion, they are granted a judgment. And if the plaintiff brings the motion from the other side, because the statute doesn't say who brings the motion, if it even needs to be by a motion. And so in this case, there was no separate claim. The Bozma case says it. If you look at the application of Section 2-1113, there's no practical way that it's a summary judgment motion to ask the court to find you can't, that this should not be appropriate. Couldn't, I mean, wouldn't it be more appropriate, we've been talking about summary judgment. Yes. But let's say a motion eliminates granting. Yes. And they don't have any evidence. Wouldn't it be proper then when the plaintiff closes to have a motion for a directed verdict? No. Because they didn't have any evidence to support their claim. Well, they would be putting on evidence that they could not later tie up. The jury would be confused hearing all about how these things don't normally occur in the absence of negligence, which would not be relevant to a claim that's not a res ipsa claim. I'm saying grant the motion and limit it. Right. Okay. So you can't put on the, that's what the motion eliminate is, you can't put on evidence. Right. Right. Then when it's not, then there isn't evidence supporting the claim, it's a motion for a directed verdict. The jury doesn't hear the stuff that they don't hear. Well, that's true, but we did bring the motion for a directed verdict. But let me say, though, that I think that just as a technical matter, that the res ipsa law order is a rule of evidence. It is an evidentiary tool that's used in specific circumstances. It is not a claim. There's case law, we've cited several cases that provide it is not a cause of action. When you get a ruling on it, you don't get a judgment. And there's no case that provides, that I'm aware of, that provides that you can't ask the court, because the court is obligated by statute to make the decision that she makes. And the statute applies specifically to medical malpractice cases, and it doesn't say you need to bring it as a motion for summary judgment. It means it's an evidentiary question? That's all it is. It's a question of what evidence can come in. And that's what we did. The court engaged in the exercise prescribed by the statute. There's no case that says that that has to be done by motion for summary judgment. And, again, it makes no sense to do it that way, because you don't end up with a judgment. You bring a motion, and it's just that eventually. There's also no case out there, as counsel has pointed out, and Justice Griffin has stated, where a case was terminated with a motion in limine. It should have been brought as a motion for summary judgment. It was not brought timely as a motion for summary judgment. So what it appears, according to the plaintiff's argument, is there has been some attempt to skirt around the rules by simply bringing a motion for summary judgment two days before trial, or maybe the day before trial, as a motion in limine. That would be correct. And so the trial judge made no finding that this was a situation where the trial judge should be considering a motion for summary judgment two days before trial. What the judge says is some smart comment about — I don't remember the judge's comment right now, but it was a really smart comment. We'll go back to — I'll find it, and I'll give it to you, if you don't mind. Well, let me address that, then. That would be correct if we obtained a judgment. If the case were dismissed at that time. But the case was not dismissed at that time. And, again, if you look at — I mean, just the procedure prescribed by the statute is the judge is admonished to make a — in fact, it was not a common law before the statute was passed relating to medical malpractice. The court is obligated to make a judgment, does RAE-SIPSA apply in this case, and that's something the judge makes at trial, and there's no provision for it being summary judgment. The judge simply said that ship is sailed. Well, there was a lot of discussion about it by the time she said that. And she entertained the argument over and over again. But really, if I may address the applicability of RAE-SIPSA in this case based upon what the evidence is, this is not a case — like, I went through every case cited by both parties. Every RAE-SIPSA case where RAE-SIPSA was allowed was a case in which there was an injury that was acknowledged. And there really no injury happened. There was no dispute whatsoever about whether an injury happened. You had a blown-up car. You had a house blown up. You had someone waking up at the lunchroom. Well, if there was a factual dispute about whether or not an injury happened, isn't that for the jury to determine? No. It's not. Under the cases that we've cited, which include the Rowley case, the Rosso case, and the Mappity case — So the judge should make the factual finding that in this case there was no injury. No, no. That the court under Section 2-1113 has to decide, does it apply? We all understand that the court has to decide whether it applies, but the court can't make that factual finding as to whether or not an injury ever occurred. But the case — but the case is cited — The question the court is asking is whether or not this was an injury that would not otherwise occur unless there is some negligence. The court is asking the question whether or not there was a complete control on the part of the defendant. Those are the questions the court is asking. You're right. Under the Mappity case, the court's obligated to ask an additional question. And that is, and I'm quoting, Before an exception can be applied, it must be shown that the injury can be traced to a specific instrumentality or cause — Or why. Or why. Or cause for which the defendant is responsible or the defendant is responsible for all reasonable causes to which the accident can be attributed. If there are different possible causes where such doesn't apply, and here you've got two places in the record where injury to this woman's elbow happened, and the evidence that presents itself is there is no evidence. And Mappity was a motion for summary judgment. Similar comments are made in the Rowley case and in the Loza case. Motion for summary judgment? I don't know. Loza? Motion for summary judgment? Loza's motion for summary judgment. That's kind of the point. I just, I simply say that I'm unaware of any rule that provides that the statute can only be applied for summary judgment. It really is the kind of thing that I've been in cases where we've done it at the jurisdiction phase. It's like the purpose of a motion in limine is evidential. They're dispositive motions. Yes. You know, I mean, it's just that fundamental. But it didn't dispose of the claim. And that's all I can say is that it simply didn't dispose of the claim. And this Court, in the Oakage case, addressed a very similar point. In that case, happened to find that there was a separate claim and it was inappropriate, but that it made no difference because they couldn't prove their case. Here, at the end of the day, the question is, here we are looking at the evidence they presented. They presented, they're not arguing that they didn't present evidence sufficient to sustain a recipient instruction. That's not what they're arguing. And what was the ruling on the motion for summary? The motion eliminated the evidence. I don't get it. I'm unaware of any evidence that they said we didn't get to produce. So was the jury. But the difficulty, at this stage, that we know for sure, and this Court has decided At this stage, yes, we're pretty confident. I'm appealing. You're appealing today. The only stage I've got. When you're entitled to affirm on any basis offered by the record. In this case, it cannot be disputed that there are two distinct points in time when the potential for injury to have occurred. I would suggest that the injury in the second By the way, Dr. Lerido was disclosed to testify. Not pulling the needle out. That's not anything that was the cause. Dr. Lerido was disclosed in his 213s and in his deposition to testify that the insertion of the needles in the arm in the second hospitalization, only after that happened, that was the first time there was ever reference in the medical records to discomfort in the right arm. And the subsequent testimony by the treating physician, Dr. Coates, was that she was on anticoagulation, meaning that she bled and a hematoma formed. And her doctor said the hematoma was pressing on the nerve. And that's what was causing it. That was a capital cause of that injury. When you have two capital causes, three steps you can't apply. Is it then that you're saying that even if this might have been better brought to summary judgment, the way it went down in this case, no harm? Just like the Oak Ridge case. Exactly. No harm. No harm. That's your bottom line. That's the bottom line. Either way. Either way. Because whatever else happened, we knew what the evidence was. The evidence was, there's no other evidence that would have made a difference. The evidence was that Dr. Coates stood up in an opening statement and said, Mrs. Willis awoke from surgery and complained of excruciating pain on the inside of her elbow. That was an opening statement. That was not so. There was never testimony about that, either a discovery nor a trial. There was never testimony about any pain in the right arm, no pain at all in the right arm, until after the needle stick in the second hospitalization. So when you have those two things going on, reception can't apply. Because irrespective of whether it's on summary judgment or not, the analysis is the same. The facts are there were two points in time the plaintiff is unable to demonstrate that we had exclusive control, because we had no control, over what took place in the second hospitalization. There was no place for a resubmission. How did the jury instruction work in that instance? They can't. They're designed for when you know there's an injury. In every single case in which resubmission was applied that the parties have cited, both parties, in every one there was a known injury. There was no dispute about whether the injury happened. So you're saying there was no issue of fact in this case? What I'm saying is that the only time resubmission applies is when there's no issue of fact as to when the injury happened. That's what I believe the law is. This guy was up for surgery? Couldn't you put out a defense that it didn't happen during the surgery? It happened at the second surgery, couldn't you? Sure. I know that's far out, but couldn't you put that out? We could put that out. And we did put it out. That's exactly right. The question is, because those are the facts. But doesn't the jury decide the facts? I appreciate, you know. No. No. No. The statute provides the court. If you take it to a logical conclusion, then what else is the court going to talk about when it's deciding whether it applies or not? We've given you that information. I think you're also confusing two things, a cause of action and a claim. When you say that resubmission is not a claim, it's clearly a claim, so you and I disagree. It's clearly a claim. That's where we'll start. You and I disagree. I'm not saying that's a question. That's more a question. You're confusing the two things. As I understand it, perhaps it's my misunderstanding. That's fine. You say it's not a claim, and I say it is. We disagree. Okay. In a reasonable mind, specifically. That's right. I'm just going to clarify. Yes. It is called a doctrine. It's not called a doctrine of racist or lack thereof. It's a static claim. I can pull up 100 cases right now where the appellate court refers to it as a claim. I will say this. I think maybe this is where I'm misdirected. You think you're correct, right? That's what I'm about to say. No, go ahead. No, no, no. What I'm about to say is I think what's happened, because I've seen what's happened, is it's a convention for it to be pleaded as a second count. It's very common for that to occur. And we treat it like that. We talk about it. But at the end of the day, it is not a cause of action, and I don't know that there's a distinction to make it a claim that makes it anything other than a rule of evidence. In fact, I believe it's the Baltimore case that says you don't need to even plead it. As long as you've got a 622 report that says that whelming doesn't happen in the absence of negligence, you can go to trial and you can have a jury stretch it. You don't need to plead res ipsa in order for it to be used in a trial if the facts call for it. And that case would be Daryl versus Daryl. I'm sorry. 1992 case. Yes. I mean, so res ipsa doesn't need to be pleaded to be used in trial. So as a consequence, I'm not sure we're going to use it. I'm not sure we're going to use the terms the same way. But I think. Then it would never get in once the motion eliminates granted, right? Well, that's this case. It doesn't matter whether it's clear or not. And once the motion eliminates granted, it's not getting in. That's this case. Well, if you have to address it, if you don't. No, no, no. I'm going to say. I'm going to say. They were allowed. They were allowed to put a jury instruction in. I agree with that. But I would say that this court. To us, it's a slight repetition, which is you may affirm on any basis. And on these facts, res ipsa is not appropriate based upon the fact that there are two potential causes. And a reasonable jury could conclude that the cause not in our control caused it. The second thing is the two issue rule. We disputed negligence and we disputed proximate causation. We don't know whether the jury concluded that we did not proximately cause it or that we weren't negligent. The statute is still in place that would have entitled them to a special interrogatory to determine that. And as a consequence of them not having done that, we have only a general verdict in favor of defense. And where we have two defense theories, we weren't negligent and we didn't cause it. A general verdict is sustained. And there's no basis for us to reverse it. And that's, I think, probably should have started with that. I mean, that's the fundamental common law problem that they got with the claim. If it were a summary judgment motion, and I still think it is, so I'd obviously disagree, but I think that it would be a. Silverstein actually was the one who should have done the case. It was. And that's the case where the lawyer, and I've always thought of it as the case of tough cases make bad law because in that case, the lawyer admitted that's what he was doing was sneaking in a motion for summary judgment. That's not what happened here. It wasn't admitted here, right? Well, again, I don't think in Silverstein they had the advantage of arguing that it's not. We have the Boerswold case that says it's not a cause of action. And they did get a judgment and we didn't get a judgment. I think those are critical distinctions. I think to not maintain that distinction, to make it that a motion that does not seek a judgment is, in fact, a motion for judgment, I think would be, would commit to some extra results that I don't think is justified here. But I would ask you to focus at this stage on the two-issue rule because I think under the common law, I think that they are not entitled to reverse it because the general verdict was for the defense and there was more than one issue on it and they did not distinguish. Great. Thank you very much. Thank you. Thank you. Yeah, we've gone way over, but go ahead. Just if you take counsel, the defendant's argument to the logical conclusion, take it a little bit further, I guess the plaintiff made a huge mistake bringing also a negligence claim against these defendants. If we would have just brought a reciprocate claim, would the defense still be able to say that this motion in limine was not dispositive motion? Of course not because that would have gotten rid of our whole claim. So we made the huge error of explaining to the jury other different possible causes or how the injury could occur. It makes no sense to argue that a motion in limine brought to bar a reciprocate claim is not a dispositive motion because if that was the only claim that we had and it was brought, that would be it. We would have no case. The other thing, counsel talks about the two-issue rule. Well, the fact of the matter is, is that we were barred from presenting evidence that this is the type of injury that usually doesn't or ordinarily doesn't happen in the absence of negligence. We were barred from presenting that evidence from our experts and we would have been able to present that evidence from defendants' experts as well because they all agreed to that as well. An ulnar injury, nerve injury occurs, can occur during a surgery, but not an injury to the median nerve. This was the type of injury. This was the classic reciprocate case. This was the type of injury that usually ordinarily doesn't occur but for negligence. And we were barred from doing that at the time of trial. Our case was worked up and prepared with the reciprocate case and we were basically, we were sandbagged at the time of trial. The other thing that our case that the court recently decided, that case just doesn't apply. What that case talks about is it's a negligence action and the allegations of negligence were operative negligence and post-operative negligence. And the court, and I think it was Justice Mikva that wrote the opinion and she said these kind of dispositive motions, they're not favored, but in that case it was harmless. And the plaintiff's attorney agreed that they had no expert testimony regarding that operative negligence. They had an internist to testify regarding a general surgery issue, whether a bile duct would be cut during a cholecystectomy. That case absolutely doesn't apply and the court shouldn't rule that this was not anything but a motion for summary judgment that brought, maybe Mr. Samos and the defendants were smart enough not to say this was gamesmanship and this is what they were doing, but that's what it was. Thank you, Your Honors. Thank you very much. Appreciate your arguments and your briefs. You did a great job with it. We'll take it under advisement.